IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STAMP V. STAMP


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


MARA A. STAMP, APPELLANT,

V.

AUSTIN J. STAMP, APPELLEE.


Filed September 10, 2019.    No. A-18-586.


Appeal from the District Court for Buffalo County: WILLIAM T. WRIGHT, Judge. Affirmed.

Heather Swanson Murray, of Swanson Murray Law, L.L.C., for appellant.

Adam R. Little, of Ballew Hazen, P.C., L.L.O., for appellee.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

Mara A. Stamp and Austin J. Stamp were married in April 2015; Mara filed a complaint for dissolution of marriage in September 2016 and simultaneously filed motions for temporary orders, including a request for an ex parte order granting her immediate custody of the parties' daughter. Although Mara was granted temporary legal and physical custody of the parties' child, following a trial, the Buffalo County District Court entered a decree in May 2018 dissolving the marriage and awarding the parties joint legal and physical custody of their child. Mara appeals the custody decision. We affirm.

BACKGROUND

Mara and Austin have one daughter, Emory Stamp, who was born in 2015. Mara filed for divorce the following year. In her complaint, Mara asked the district court to award her the care, custody, and control of Emory. She simultaneously filed a motion for temporary orders, as well as a motion for an ex parte order to gain custody of Emory "together with restraining orders." Mara

claimed in a supporting affidavit that Austin had "an extremely volatile temper," screamed profanities at her, told her she was "fat and ugly," threw plates of food, threw his wedding ring at a wall so hard it put a hole in the wall, and was abusive to her dog when angry. Mara also alleged that Austin told her he was going to take Emory from her; she was fearful that Austin would "take Emory and run off with her, just to get back" at her, "as he knows Emory is the most important thing in the world to [her]." On the same day Mara's initial pleadings were filed, the district court entered an "Ex Parte Order" granting Mara ex parte custody of Emory and restraining Austin from harassing, molesting or disturbing the peace and quiet of Mara, and further restraining him from transferring, selling, or otherwise encumbering or destroying any marital property other than as necessary in the usual course of business or necessaries of life. Eight days later, on September 23, an attorney entered an appearance on behalf of Austin; an "Answer and Counterclaim" was subsequently filed in which Austin sought restraining orders against Mara, as well as sought custody of Emory.

On October 5, 2016, a hearing took place in which the parties were not present but were represented by their attorneys. The district court indicated the hearing would proceed "solely on affidavits, as opposed to live testimony." Nine affidavits were received subject to foundation and hearsay objections. The affidavits are contained in our record; in Austin's affidavit, he requests custody of Emory "or at a minimum, joint physical custody." The affidavits reveal that the parties initially connected through Facebook while they were both living in Norfolk, Nebraska, in the spring of 2014. They moved in together a month after they started dating, and in August, Mara purchased a home in which they both resided. By October, they learned Mara was pregnant, and they were married in April 2015. Each party described various levels of conflict existing in their marriage, and each party gave examples of erratic behavior by the other person. Mara took a job in Kearney, Nebraska, in April 2016, and after about 3 weeks, Austin moved to Kearney and obtained a new job.

A temporary order was entered in October 2016. It gave Mara temporary legal and physical custody of Emory, with Austin receiving parenting time every other weekend from Friday at 6 p.m. until Sunday at 5 p.m. Austin was also given parenting time with Emory every Wednesday from 5 p.m. until 7:30 p.m. Austin was ordered to pay $542 per month in child support, provide health insurance, and pay 53 percent of unreimbursed health care expenses in excess of $480 per year, as well as pay 53 percent of daycare expenses. Neither party was excluded from the family home, but both were restrained from molesting or disturbing each other and from transferring or otherwise disposing of or encumbering real or personal property except in the usual course of business or for necessaries of life.

In February 2017, Austin obtained new counsel, and a pending pretrial conference was rescheduled to later that year. Trial commenced in January 2018. Mara and Austin were both 27 years old at that time, both were living in Kearney, and Emory was 2½ years old. Mara was employed as a probation officer with the State of Nebraska; Austin was employed as an electrician.

MARA'S EVIDENCE

According to Mara, after she and Austin began living together, they fought "quite a bit," and Austin demonstrated controlling behaviors such as telling Mara what she could or could not wear to the gym, or questioning how long it took her to come home from the gym, or inquiries as

- 2 -

to what she was doing if she stayed at work late. Mara claimed Austin became "emotionally abusive" towards her, calling her names; for example, if she wore "certain shorts," he would tell her she was "a fucking slut," or a "fucking whore." Mara testified that Austin would tell her she was doing the bills wrong, or "would look over [her] phone" or take her phone. She claimed one night "he threw [her] phone at [her] . . . and said terrible things to [her] because someone had text messaged [her] when they were intoxicated." He told her she was a "cheater" and a "fucking slut" because somebody had messaged her. Mara said these were "red flags" before Emory was born. She said it began "to get a little physical," meaning "[p]ushing each other." Mara also testified about Austin using steroids before Emory's birth, but that he stopped when she asked him to stop. Mara believed that Austin's aggressive behavior towards her was the result of him taking steroids. When Emory was born, Austin was present and stayed at the hospital with Mara for 2 days. Emory subsequently had "RSV twice" and was hospitalized. On one of those occasions, Mara was also sick and had to leave Emory at the hospital, so Mara's mother helped care for Emory; Austin stayed with Mara. The other time Emory was hospitalized, both Mara and Austin stayed with her. Emory also had to have surgeries for her ears and adenoids; both parents were present for those surgeries. Mara testified that she was the parent who scheduled appointments for Emory and took time off work when Emory was ill. She also took care of making daycare arrangements for Emory, and was the one who dropped Emory off at daycare and picked her up. Mara's work hours were "8:00 to 5:00," while Austin's hours were more like "7:00 to 6:00" Monday through Friday because he was working for an electric company in Elgin, Nebraska, at the time.

After Emory's birth, Mara made meals, cleaned the house, did the laundry and yardwork; she indicated this was a source of contention between her and Austin. Mara testified that for the first 6 weeks following Emory's birth, Mara was responsible for getting up in the night when needed; after that, it was "normally" Mara, but "[Austin] would help out." Also, according to Mara, it "seemed like we argued about every -- everything." They would argue about finances, "he thought I was lying to him about financials." They also argued "about silly things like cheating, things like are you talking to somebody else, those kinds of things. Constantly." When asked who started the arguments, Mara said "it would vary." When asked if Austin ever became physical with her, Mara said, "It started out kind of slow." The first time Austin was angry with Mara, he told her he was leaving, took his ring off and threw it at a wall (while in Norfolk). Mara claimed this "put a hole in the wall." During that same time, he also "threw a plate of food so hard on the coffee table the food went everywhere," and then he left. This occurred before Emory's birth. Mara said there was another incident when Emory was several weeks old and Mara was holding her and feeding her a bottle. Mara testified that she and Austin were "yelling at each other" and Austin "took the bottle out of [Emory's] mouth and threw it at the wall." We note that in Mara's affidavit (signed September 30, 2016) offered in support of temporary custody, Mara averred that when she was holding Emory and feeding her, Austin "ripped her bottle from me and threw it against the wall."

On another occasion while they were still living in Norfolk, Mara said Austin called her an extremely derogatory name, so she "slapped him and hit him across the face." She slapped him with an open hand and "he slapped me right back." Mara said she was holding Emory when this happened. Mara said this left "a huge mark" on her face; she left and took Emory with her to a friend's house but returned home later because she "wanted it to work . . . I wanted us to be together

and us to work." However, she claimed to be scared of Austin. After moving to Kearney, Mara said Austin's anger continued but "he never physically touched" her in Kearney. However, the "name-calling and the degrading got a lot worse." This caused Mara to start calling her mother or one of her friends and placing her phone somewhere while she and Austin were arguing "so they knew [she] was okay" because she "was scared of him." She instructed her mother and friends to call 911 if they heard anything suggesting she was being harmed. Mara claimed Austin called her names daily, things like "you're fucking fat; you are fucking ugly; you have acne on your face; your face is ugly, things more degrading about the way [she] looked." Mara said she would call Austin names, but she did not degrade him the same way. Mara also claimed the name-calling occurred in front of Emory.

Mara testified that the main source of conflict between Austin and her was his steroid use. But they would also argue about when she needed help or about dividing household chores; she said Austin was also very insecure about Mara cheating on him. As to Austin's steroid use, she last saw him inject himself right before she filed for divorce, which was when he started using them again and they were arguing. Mara admitted to using steroids herself after they were married and had Emory and were living in Norfolk. She "felt fat, [she] felt ugly," so she started using a steroid that helps women "lose weight and get lean." Mara said she quit using the steroid after about a month because she noticed "effects" such as being "irritable" and she was not seeing that she "was changing at all, not the way [Austin] does anyways." She claimed she did not discuss steroid use at the time of the temporary hearing "[b]ecause [she] was scared of him." Mara said Austin threatened "to take [her] job from [her] because of it." Austin denied making any threats, but did acknowledge telling her it would not look good for a probation officer to have taken steroids or be living in a household with steroids in it. According to Austin, Mara asked him to keep the use of steroids quiet after they separated. Mara testified that she was disclosing the information at trial because she wanted the court to "know what [Austin] is doing and that it is in the best interest of [Emory] to not be around that." Austin testified that he last used steroids in December 2016.

Mara described another incident that took place after she filed for divorce (September 2016) but before the temporary order was entered (October). She said that she and Austin were sleeping in different bedrooms "and we argued often about our divorce stuff and custody and all that. He was trying to get back together with me." She had locked her bedroom door, but Austin would "pop the lock and come in." On one occasion, he tried to have sex with her, but after "three tries he finally left the room." Austin acknowledged trying to be sexual with Mara, but she did not want to, so he did not keep trying nor did he force himself upon her. Mara also testified that during that same timeframe, Austin "tried to take Emory after work one day up to Elgin, and [she] told him he could not." She said she had an ex parte order, "and so [she] had to call the police."

Mara testified about Austin and herself dating other people during the pendency of their case. Mara had one individual stay with her for a couple months; they were dating and she introduced him to Emory. Mara claimed Emory would have only seen them at dinnertime together or watching television or playing together; if she saw "anything affectionate between us, it would have been, like, a hug."

Mara indicated she was aware that Austin was asking for joint custody, and when asked if she believed that was in Emory's best interest, Mara responded, "Absolutely not." She explained

that she had been "the primary parent since the moment [Emory] was born." Mara said she had "done everything . . . taken [Emory] to the doctor . . . taken vacations, sick days for her."

On cross-examination, Mara acknowledged that she made comments about Austin's height, but that she was joking. (Austin testified that he was sensitive about his height.) She testified that she told Austin that she had slept with his best friend, but that was "after he told me he slept with mine." Mara said that she and Austin had talked about informing each other if either of them "got serious with somebody," but there was "no written agreement or anything like that." Mara did introduce Emory to a boyfriend she started dating in March of 2017; he started staying with Mara in July. She did not inform Austin about this boyfriend before introducing Emory to him, nor did she tell Austin that he was living with her. The relationship lasted until the beginning of October. At the time of trial, Mara was in a different relationship with someone she had been seeing for about 2 months. This boyfriend also stayed the night when Emory was present, beginning 3 to 4 weeks before trial; Mara had not notified Austin about this boyfriend being around Mara.

As to whether arguments with Austin had decreased since she filed for divorce, Mara said, "It's very sporadic. There are months where we get along and then there are months where we don't get along." But she agreed that she and Austin had been good to one another for the "time being," and it was possible for them to get along "[a]t times, yes." She agreed that Austin had a beneficial relationship with Emory, but she wanted the parenting time to "remain the way it is right now." Mara noted that she and Austin had spent time together with Emory since she filed for divorce, such as going to the park with her, taking her trick-or-treating on Halloween, carving pumpkins, going out for ice cream together, and sometimes having dinner at Mara's house. They also agreed to file joint tax returns for 2016. Mara stated, "I think it's possible for us to get along regarding [Emory], however, I think it's in her best interests to remain with me."

Mara did not support joint physical or legal custody because she and Austin "do not get along well enough for a long enough amount of time to make that work, as well as [Emory] has been very, very accustomed to what she has been doing in the last 2 1/2 years of her life." Mara believed that to change that "would be absolutely detrimental to [Emory], absolutely."

A licensed independent mental health practitioner (counselor) testified. She began seeing Mara in March 2016, saw her for a period of about 4 to 5 months, then saw her once in 2017, and again "recently." Austin participated in two sessions with Mara. The focus of the counseling when Mara first came in was to work on the marriage, communication, and coping skills. During the two sessions Austin was present, Mara expressed concerns about "[a]nger issues and verbal name-calling." According to the counselor, Austin acknowledged engaging in that behavior, and after two sessions, he declined to continue. On cross-examination, the counselor could not recall whether Austin expressed any concerns about Mara being verbally or physically abusive with him. The counselor testified that both parties expressed having difficulty communicating with one another and that it was an issue they needed to work on.

A 23-year-old friend of Mara's testified that she knew Mara her "whole life." She spoke about Mara being a "great mom." The friend also testified that Mara and Emory came to her house after Mara had an argument with Austin and the friend observed a red handprint on Mara's left cheek. Mara stayed "two hours, and then she went back home because she wanted to work things out."

The owner of a daycare facility testified; Emory had attended the daycare "for quite a long time." According to the owner, Mara dropped Emory off in the morning and Mara picked her up in the evening. She testified that Emory is "very smart," a "very good girl," and is "extremely excited" when Mara picks her up.

A juvenile probation officer who had worked with Mara for 2 years (Mara was her mentor) stated they had "remained best friends for the last three years." The colleague testified that Mara "was very respected in our office."

Mara's mother testified that Austin "did help in the beginning." He changed diapers and they (Mara and Austin) "did a lot of stuff together in the beginning." She discussed going to Emory's medical appointments, and she testified about receiving telephone calls from Mara "at least five times" when Mara and Austin were fighting. She could hear Austin calling Mara names, but she did not ever call the police. She explained that since she was there on the telephone, she knew "if there was something, if he physically hurt her, [she] would get ahold of the cops." Mara's mother could not recall whether Mara called Austin any names. She discussed the time Mara and Austin lived with her for about a month before they moved into their Kearney home. After they moved out, Mara called her and asked her to bring a suitcase that Austin had left in a closet; without being asked to do so, Mara's mother looked in the suitcase and saw syringes and vials, but she "did not read" what was contained in the vials.

A Kearney police officer testified about an incident report he prepared on September 22, 2016. He said it was a "disturbance . . . they were having some type of relationship issues and there was an argument involved; however, . . . we didn't uncover anything criminal." There was no assault that took place; it "was just a simple disturbance. We get a lot of calls like that." There was no reason to make any arrest or issue a citation.

AUSTIN'S EVIDENCE

Austin's "boss" from his employment at the time of trial testified that Austin had been a foreman with the company for about 4 months, and he was "a good employee." Typical work hours for the job are 7 a.m. to 4:30 p.m. Those hours are flexible, and the boss testified that Austin could start work later on weeks he had his daughter, and that the company would also make sure Austin did not have any overnight assignments during those periods.

Another witness, the owner of a business in Elgin, testified that he had been friends "of the family" for quite a few years and also that Austin had worked for him as a foreman electrician when Austin was living in Norfolk. The business owner would see Emory with Austin at Austin's parents' house, as well as at high school basketball games, volleyball games, and in church. He observed Emory to always seem happy and Austin "always seemed very attentive to what she was needing. It was a good relationship." He recalled Austin taking time off from work when Emory was born, as well as when she was in the hospital with "RSV." He recalled a time when Mara called Austin because she needed Austin to leave work and pick Emory up from daycare because she had a fever and Mara could not pick her up, and Austin did so.

Austin's sister testified that when the parties were living in Norfolk, she was there several nights during the week to help care for Emory "when they would want to go work out or go out for dinner or [she] would just go over there to hang out with all of them." She described Austin as being "very involved" with parenting Emory. She witnessed Austin "help with feeding her, with

changing her diapers, giving her baths, helping with bedtime routine." She also observed Austin "help out around the house with dishes or laundry or just cleaning up after Emory." Based on what she saw, the sister believed Mara and Austin split parenting duties "very evenly." She "could tell that Emory loved her mom very much and that they were close," and Austin and Emory "are very loving towards each other . . . always laughing and giving each other hugs and kisses . . . you can tell that they are very close." She said "you can tell Emory loves her dad very much." The sister claimed that Mara made derogatory statements about Austin, such as how he did not help enough around the house or with Emory, and that Mara would use Emory's hand to point at Austin "and say he was a bad dad." Austin's mother also testified that Mara would take Emory's finger and point and say, "'Emory, can you say bad dad, he's a bad dad. . . . We don't need no men in our lives.'" On another occasion at Austin's parents' house in Elgin, Mara said that "Emory is the princess, Mara is the queen and Daddy is the peasant, and they didn't need dad in their life."

Austin's aunt testified that Austin and Emory "have a very good relationship. She loves her father and he loves her. And they do a lot of stuff together and he's a great father." She said Austin reads to Emory, they watch movies, and they play games. If Emory "throws a tantrum or cries, [Austin] will just calmly tell her why she can't do that. He's very calm with her and rational." When the family gathers in Elgin, the aunt testified that Austin takes care of Emory's needs; she had no concerns about Austin's parenting of Emory.

Austin's mother testified about Mara and Austin parenting Emory together when they lived in Norfolk. She recounted an incident in September 2016 when Austin was planning to bring Emory for a visit in Elgin. However, she received a telephone call from Mara who was "very hysterical, screaming that I better tell my son to take her daughter back home." She told Austin's mother, "[Y]ou know what a good mother I am. You are such a bitch. You better tell your son to get her back or he's going to be arrested, and something to the effect of me not seeing Emory anymore." Mara testified on rebuttal that she did call Austin's mother a "bitch," but that she was very upset because she had "never been away from [her] daughter like that, especially without notice." Austin's mother said that family is very important to Austin; Emory has three great-grandparents in the Elgin, Clearwater area, so Austin brings Emory home so she can get to know her relatives and "spend family dinners together." She described various activities Austin engaged in with Emory whether in Elgin or in Kearney, such as playing hide and seek, going on walks, going to the park, taking her swimming at the local pool, and going to museums. She also described the many parental duties she observed Austin do with Emory, such as working on potty-training, getting her dressed, changing diapers, combing her hair, and bathing her. If Emory gets angry, Austin "talks to her and calms her down." Austin's mother described Austin's relationship with Emory as "[a]mazing. . . . [v]ery loving." According to Austin's mother, in June 2017, during a parenting transition, she was involved in the transition because Austin had "guard duty" and was not able to get her. At that time, Mara said that she and Austin were getting along "remarkably well. They have no problems." Mara contradicted this in rebuttal testimony; Mara said that she and Austin got along sporadically during the pendency of the case.

Austin testified about the flexibility of his employment as an electrician with regard to setting work hours to accommodate his parenting time with Emory. If he could have Emory for a week at a time, he would work Monday through Friday from 8 a.m. to 5 p.m., and then he could make up time if necessary on the weeks he did not have Emory. Austin is also in the Army National

Guard; he enlisted in 2011 for a 6-year period, and then recently reenlisted for another 6 years. Austin talked about being present for Emory's birth, and doing everything "50/50" with Mara. Austin acknowledged that when they lived in Norfolk, Mara primarily took Emory to the daycare and picked her up after work, but there were times that Mara would ask Austin to get off work early to go get Emory. When Emory was sick with "RSV" and Mara told him she was in the emergency room, Austin was in Spalding, Nebraska. He and another worker packed up and drove an hour to Elgin, and then Austin drove another 40 minutes to Norfolk. Austin described numerous activities he and Emory do when together, as well as things they do with other relatives. Austin said his family "is very, very close," and that he loves seeing his parents and family. "Everyone loves being together." Austin gave a number of examples of Mara not being flexible with parenting time when Austin would ask for some additional time, such as when his sister from Colorado was in town, as well as other times when Mara would respond that she already had plans, or that he was welcome to meet them at the park, or she would tell him, "'You get her Wednesday.'"

It was Austin's belief that he and Mara were able to get along and make decisions together, and that they were able to communicate with each other regarding Emory. Austin admitted that some of his and Mara's behaviors during the marriage were a little immature, but that the two of them had grown up since then. He acknowledged that he called Mara names, and that she called him names, too, such as "fucker," "asshole, dick, anything along [those] lines." Austin disagreed that he had been physically abusive towards Mara. He acknowledged there was one time in the closet when Mara slapped him and kept hitting him, so he held her by both arms against the wall and told her to stop. He said Mara hit him three to four other times with her fist; this was in 2016 before they moved to Kearney. He denied slapping Mara while she was holding Emory, and he denied slapping Mara after Mara slapped him. He also denied taking a bottle out of Emory's hand and throwing it against a wall.

As for counseling, Austin only went two times because when they talked about things to work on to help the relationship, Mara was not willing to work on them. He gave as an example that Mara would talk to her mother about their sexual relationship, and it was "obviously awkward" to know "that is being told to her mother, and then you go over there to hang out." Other than parenting time, Austin said there had not been "much at all" that he and Mara were unable to agree upon.

DECREE

A dissolution decree was entered on May 2, 2018. The district court made findings, detailing many of the facts set forth above, including the allegations of degrading comments, slapping (by both parties), and other favorable and unfavorable behaviors by each party. The court concluded there was "no evidence of child abuse or neglect. There is anecdotal evidence of verbal and some limited physical aggression between the parties when Emory was present, but there was no evidence that Emory has in any way been injured physically or emotionally." The decree goes on to state:

> Mara characterizes at least some of the earlier disputes between the parties as being physical abuse. By her own admission, however, any such physical abuse occurred before the parties moved to Kearney in May of 2016. Both parties have exchanged name calling, insults, and suggestions that each has cheated on the other, purposely to injure the other

emotionally. Both parties demonstrate an immaturity and pettiness in their contacts with each other which, though concerning, do not suggest that they will be unable to make decisions or determinations with regard to their child's welfare. There have been no disputes of any significance between the parties about Emory's care, discipline, medical treatment, and growth.

The district court expressed concern about Austin's use of steroids, and noted that both parties admitted to taking steroids during the course of their relationship. The court observed that although Austin claimed to have stopped using steroids in December 2016, there was some evidence suggesting more recent use. However, the court concluded that there was no evidence of "side effects displaying themselves within the last year." The district court found the disputes between the parties to be "generally minor in nature" and "[w]hile the parties' communication with each other through text and otherwise reveals occasional immature and emotional flare-ups, the parties . . . generally appear to communicate effectively concerning the child and the child's needs." The court acknowledged both parties having "warm and supportive" environments, and both parties' "support systems revolve around their families." As to joint custody, the court stated:

> While Mara suggests that, in her opinion, there is no way the parties could make joint physical custody work, the Court disagrees. Exchange of the child every week, at least until the child is in middle school, would, in the Court's opinion be in the child's best interest. It is clear that this will require cooperation, trust, some sacrifice, accommodation, empathy, and a change in priorities for both parties. Emory's needs, life, experience, education and happiness must be the first priority for both parents over work, body building, hunting, or the social life of either. There must, however, be no suggestion of any continued use of anabolic steroids. The Court will, in essence, adopt Austin's Parenting Plan but add provisions prohibiting the possession or use by either party of controlled substances to include anabolic steroids, and imposing severe consequences in the event such possession or use occurs. The Court has included what it believes are sufficient protections in its proposed Parenting Plan.

In the Parenting Plan, the district court provided a section entitled, "Additional Security Provisions." It contains a paragraph prohibiting both parents from possessing or consuming nonprescription controlled drugs "to include anabolic steroids or human growth hormone regardless of whether the child Emory is in their immediate custody or control. The use or possession of same, as may be established at hearing, may be grounds for loss of joint physical and legal custody."

### MOTION FOR NEW TRIAL OR TO ALTER OR AMEND

Mara filed a "Motion for New Trial and/or Motion to Alter or Amend," and Austin filed a "Motion to Alter or Amend Dissolution Decree." The district court heard arguments from the parties' attorneys, including an argument by Mara's attorney that the court erred by failing to find credible evidence of domestic violence pursuant to Neb. Rev. Stat. § 43-2923 (Reissue 2016), and that the court did not make a specific finding of joint custody being in Emory's best interests. The district court stated that with regard to joint custody, the court had "considered everything," and

"made a general determination of fact that . . . the most appropriate thing under the circumstances was joint custody with the facts and the information that I had at the time, and that that was in the best interests of the child." The court went on to state:

> Yes, there was evidence clearly that both parties probably were responsible for some acts that could be declared as violent, but those have been considerably in the past. And in essence, the question is whether the parties with joint custody as opposed to living with each other would create an ongoing danger of one or the other. Frankly, the Court didn't find that that was the circumstances that existed, at least under the evidence it received.
>
> . . . .
>
> . . . This has been a long, emotional, vindictive and, quite frankly, embarrassing dissolution action or at least it should be for both sides. You both behaved like a couple of children in this case.
>
> What I attempted to do in my order was at least reach a resolution that sounded fair and sounded as though it would probably create for the child a result that would be in the child's best interests. The child has bonded clearly to both families and both parents. The parties live in the same town, they ought to be able to split this child's physical custody evenly and do [] so in a civil manner.

In an order entered May 24, 2018, the district court concluded Mara's motion for new trial based on newly discovered evidence was "essentially frivolous" and should be denied. The court also found no merit to either party's request to alter or amend the decree.

Mara timely appealed.

## ASSIGNMENTS OF ERROR

Mara claims, consolidated and restated, that the district court erred by (1) not making specific findings that joint physical custody was in the child's best interests and awarding joint legal and physical custody, and (2) failing to find credible evidence of domestic abuse by Austin against Mara, and failing to make written findings as required by Neb. Rev. Stat. § 43-2932 (Reissue 2016).

## STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and

observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

## ANALYSIS

### AWARD OF JOINT LEGAL AND PHYSICAL CUSTODY

Mara assigns as error that the district court failed to make specific findings that joint custody was in Emory's best interests, and that the evidence at trial proved that a joint legal and physical custody arrangement was not in Emory's best interests.

Nebraska's Parenting Act defines joint legal custody as "mutual authority and responsibility of the parents for making fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Joint physical custody is defined as "mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." § 43-2922(12). The paramount consideration in determining child custody is the best interests of the children. *Donald v. Donald, supra*.

A court may order joint custody "if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent." Neb. Rev. Stat. § 42-364(3)(b) (Reissue 2016). In determining custody, § 43-2923 states, in pertinent part:

> (6) In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. . . . and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

We first address Mara's claim that the district court failed to make specific findings that joint custody was in Emory's best interests. As previously set forth, the decree does specifically state that the "[e]xchange of the child every week, at least until the child is in middle school, would, in the Court's opinion be in the child's best interest." Although this reference can be construed as meaning joint physical custody, there is no specific reference to joint legal custody. However, when this issue was raised at the hearing on the motions for new trial or to alter or amend, the

district court stated that with regard to joint custody, the court had "considered everything," and "made a general determination of fact that . . . the most appropriate thing under the circumstances was joint custody with the facts and the information that I had at the time, and that that was in the best interests of the child." It is clear that the court concluded joint legal and physical custody of the child was in Emory's best interests.

As to Mara's argument that "the evidence is clear that joint legal and physical custody was not and is not in [Emory's] best interests," brief for appellant at 11, we cannot agree that the evidence was so clearly against the court's determination that it constitutes an abuse of discretion. Mara's primary argument is that she was the "primary caretaker for [Emory's] entire life," and was the "parent responsible for the majority of parental functions within the home." *Id*. While the evidence supports that Mara did in fact assume primary responsibility for taking Emory to daycare and picking her up, as well as primary responsibility for getting Emory to various medical appointments, there is also evidence that this was an arrangement agreed upon by the parties in light of their respective work schedules and the availability of vacation or sick leave at their places of employment. There is considerable evidence that both parties engaged in hands-on parenting while Emory was in their care, as well as evidence that each had a loving relationship with her. There was also evidence that Austin obtained employment which would allow him flexibility in his scheduling during any parenting time he would have with Emory. Based on the evidence in the record before us, we cannot say the district court abused its discretion by awarding joint legal and physical custody.

DOMESTIC ABUSE AND WRITTEN FINDINGS

Mara contends that there was credible evidence of domestic abuse by Austin against her. She claims that § 43-2932 "imposes several obligations upon a court" when domestic intimate partner abuse is established by a preponderance of the evidence. Brief for appellant at 20.

Section 43-2932 states in relevant part:

(1) When the court is required to develop a parenting plan:

(a) If a preponderance of the evidence demonstrates, the court shall determine whether a parent who would otherwise be allocated custody, parenting time, visitation, or other access to the child under a parenting plan:

(i) Has committed child abuse or neglect;

(ii) Has committed child abandonment under section 28-705;

(iii) Has committed domestic intimate partner abuse; or

(iv) Has interfered persistently with the other parent's access to the child, except in the case . . . ; and

(b) If a parent is found to have engaged in any activity specified by subdivision (1)(a) of this section, limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm. . . .

. . . .

(3) If a parent is found to have engaged in any activity specified in subsection (1) of this section, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection. The parent

found to have engaged in the behavior specified in subsection (1) of this section has the burden of proving that legal or physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent.

When a parent's commission of one of the listed actions in § 43-2932 is established by a preponderance of the evidence, the court must make a determination to that effect. See *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). Such a finding, in turn, obligates the court to impose any necessary limitations on custody, parenting time, and visitation and to make specific written findings prior to awarding legal or physical custody to the parent who committed the listed action. *Id.*

In *Flores v. Flores-Guerrero, supra*, a district court awarded joint physical custody in a modification action without making written findings regarding the father's conviction for third degree domestic assault against the mother of the children at issue. The Nebraska Supreme Court held that it was an abuse of discretion for the district court to make a custody determination without complying with § 43-2932 since the greater weight of the evidence in that case demonstrated that the father had committed domestic intimate partner abuse. The district court had received certified copies of an order sentencing the father to probation for his conviction for third degree domestic assault, a conviction affirmed by this court on appeal.

It is evident that § 43-2932 is designed to protect a child and/or a child's parent from potential harm by the other parent as a result of that other parent's past harmful conduct. The statute specifically tasks the court, when developing a parenting plan, to impose any necessary conditions on custody, parenting time, or other access, so that the child and parent can be adequately protected from harm by the other parent. Mara also argues that § 43-2923(6) (previously set forth above) makes evidence of domestic intimate partner abuse relevant to the court's determination of custody and a parenting plan.

In the case before us, the district court did in fact address the evidence of physical abuse in which both parties engaged. The court concluded there was "no evidence of child abuse or neglect." It noted that there was anecdotal evidence of verbal and some limited physical aggression between the parties when Emory was present, "but there was no evidence that Emory had in any way been injured physically or emotionally." The decree went on to state that while Mara characterized some of the earlier disputes between the parties as being physical abuse, by her own admission, any such physical abuse occurred before the parties moved to Kearney in May of 2016. And while both parties engaged in name calling, insults, and suggestions that each has cheated on the other, purposely to injure the other emotionally, the court considered this conduct to demonstrate an immaturity and pettiness in their contacts with each other which, "though concerning, do not suggest that they will be unable to make decisions or determinations with regard to their child's welfare." The court was more concerned about Austin's use of steroids, and because of this concern, the court included a specific paragraph to address it in the Parenting Plan under a section entitled, "Additional Security Provisions." That paragraph prohibited both parents from possessing or consuming nonprescription controlled drugs, to include steroids.

This court's de novo review of the record does not reveal any evidence to establish a nexus between any negative past conduct by Austin and his parenting of Emory. Nor does the record reveal any nexus between such past conduct and Austin's ability to coparent with Mara. And to

the extent there were concerns about steroid use, the district court made specific findings about that issue and included a safety measure in the parenting plan. The record supports that the district court considered Emory's best interests, including the requirements of § 43-2932 and the factors set forth in § 43-2923(6), when making its joint custody decision.

## CONCLUSION

Finding no abuse of discretion by the district court in ordering joint legal and physical custody, we affirm the dissolution decree.

AFFIRMED.